**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Wanmei Ni,

          Plaintiff,

v.

University of Arizona,

          Defendant.

No. CV-14-02561-TUC-BGM

**ORDER**

Currently pending before the Court is Defendant Arizona Board of Regents' Motion for Summary Judgment (Doc. 52). Defendant has also filed a Statement of Facts in Support of Defendant's Motion for Summary Judgment ("SOF") (Doc. 53). Plaintiff filed his Motion for Summary Judgment (Doc. 54), which the Court construed as a response to Defendant's motion. *See* Order 11/28/2017 (Doc. 55). Plaintiff also filed a Supplemental Brief (Doc. 56), per the Court's November 28, 2017 Order (Doc. 55). Defendant replied (Doc. 59) to both of Plaintiff's responses. As such, the motion is fully briefed and ripe for adjudication.

In its discretion, the Court finds this case suitable for decision without oral argument. *See* LRCiv. 7.2(f). The Parties have adequately presented the facts and legal arguments in their briefs and supporting documents, and the decisional process would not be significantly aided by oral argument.

. . .

. . .

. . .

# I.       FACTUAL BACKGROUND

## A.       *Plaintiff's Employment at the University of Arizona—Overview*

Plaintiff Wanmei Ni began employment with the University of Arizona ("U of A" or "University") in 1987 in the Tree Ring Laboratory.  Def.'s SOF (Doc. 53), U of A Human Resources file for Pl. (Exh. "2") at Bates No. ABOR0446; *see also* Def.'s SOF (Doc. 53) Johnson Decl. (Exh. "1") at ¶ 3.  Plaintiff continued working at the University, and in 1997 began working in the School of Renewable Natural Resources.  *Id.*, Exh. "2" at Bates No. ABOR0446, ABOR0449, ABOR0454; *see also* Def.'s SOF (Doc. 53), Exh. "1" at ¶ 4.  Plaintiff resigned from the U of A in the year 2001.[1]  *Id.*, Exh. "2" at Bates No. ABOR0449, ABOR0454.

Plaintiff returned to the U of A for employment in 2007 as an Animal Care Technician in the department of University Animal Care.  Def.'s SOF (Doc. 53), Exh. "2" at Bates No. ABOR0448, ABOR0454.  Plaintiff remained in this position for just over five (5) years, until his dismissal on August 6, 2012.  *Id.*, Johnson Ltr. to Ni 8/6/2012 (Exh. "4") at Bates No. ABOR0059–ABOR0061.  On July 17, 2017, Plaintiff was rehired by the University of Arizona as a Research Technician in the Geosciences Department.  *Id.*, Dettman Ltr. to Ni 6/22/2017 (Exh. "2") at Bates No. ABOR0443–ABOR0445.

## B.       *University Department of Animal Care*

The department of University Animal Care is responsible for ensuring the humane care and use of all animals associated with the University's research and teaching programs.  Def.'s SOF (Doc. 53), Johnson Decl. 11/6/2017 (Exh. "1") at ¶ 9.  The department exists under the auspices of the Vice President for Research.  *Id.*, Exh. "1" at ¶ 9.  The Institutional Animal Care and Use Committee ("IACUC") oversees the University's Animal Care and Use Program, and ensures compliance with federal and state laws, regulations, and guidelines governing the care, use and housing of animal

---

[1] The Johnson Declaration indicates that Plaintiff's employment ended in 2000; however, the documents designated as Plaintiff's Human Resources File indicate that his employment ended in 2001.  *See* Def.'s SOF (Doc. 53), Exhs. "1" & "2."

subjects used in research, testing, and teaching.  *Id.*, Exh. "1" at ¶ 10.  The University's Animal Care and Use Program is centralized under the University Animal Care Department, and meets or exceeds all requirements set forth by the IACUC.  *Id.*, Exh. "1" at ¶ 10.  Additionally, the facilities and animal care program are accredited by the Association for Assessment and Accreditation of Laboratory Animal Care International ("AAALAC").  *Id.*, Exh. "1" at ¶ 11.  Further, the University Animal Care Department is a Registered Research Facility with the United States Department of Agriculture, and has a National Institutes of Health Office of Laboratory Animal Welfare Assurance Statement.  Response (Doc. 53), Exh. "1" at ¶ 12.

Plaintiff's Animal Technician position paid approximately $9.30 per hour, and his job responsibilities included cleaning and sanitizing laboratory mice and rat cages, as well as feeding and disposing of laboratory mice and rats.  *Id.*, Exh. "1" at ¶ 13.  These duties were to be performed in accordance with strict standard operating procedures and other policies.  *Id.*, Exh. "1" at ¶ 13.  A failure to adhere to the standard operating procedures and policies risks placing the University of Animal Care department out of compliance with applicable legal and regulatory requirements.  *Id.*, Exh. "1" at ¶ 14.  Such a failure could also invalidate the results of research being conducted.  *Id.*, Exh. "1" at ¶ 14.

### C.    *Plaintiff's Job Performance*

#### 1. Overview

During the approximately five (5) years and one (1) month that Plaintiff worked as an Animal Technician, he made and repeated basic errors and failed to follow standard operating procedures and policies more than any other Animal Technician.  Def.'s SOF (Doc. 53), Exh. "1" at ¶ 16.  As a result of these errors, Plaintiff's supervisors, as well as University Animal Care management, communicated and counseled Plaintiff, and challenged him to improve.  *Id.*, Exh. "1" at ¶ 16.  Among those who counseled Plaintiff were his supervisors, Miguel Diaz and David White, and Director Susan Wilson-Sanders, subsequent Director David Besselsen, and Facility Coordinator Cheryl Johnson.  *Id.*, Exh.

"1" at ¶¶ 17–18.

Initially, Miguel Diaz was Plaintiff's immediate supervisor. *Id.*, Exh. "1" at ¶ 19. In 2010, David White was promoted to lead supervisor for the cage wash area, and took over supervision of Plaintiff with respect to cage wash related responsibilities. *Id.*, Exh. "1" at ¶ 19. At that time, Plaintiff's position included both animal room/animal husbandry related responsibilities, as well as cage wash related responsibilities. Def.'s SOF (Doc. 53), Exh. "1" at ¶ 19. As such, Miguel Diaz continued to be Plaintiff's supervisor with respect to his animal room/animal husbandry related responsibilities. *Id.*, Exh. "1" at ¶ 19. On August 22, 2011, Plaintiff was removed from any further animal room/animal husbandry related responsibilities. *Id.*, Exh. "1" at ¶ 19. This move was a result of both restructuring and Plaintiff's performance problems. *Id.*, Exh. "1" at ¶ 19.

## 2. Disciplinary warnings and probation

On October 20, 2009, Miguel Diaz issued a written warning to Plaintiff regarding the latter's "failure to provide consistent quality attention to work details." Def.'s SOF (Doc. 53), Diaz Ltr. to Ni 10/20/2009 (Exh. "3") at Bates No. ABOR0041. On July 13, 2011, Mr. Diaz again warned Plaintiff regarding his "fail[ure] to perform [his] assigned duties for the day." *Id.*, Diaz Ltr. to Ni 7/13/2011 (Exh. "3") at Bates No. ABOR0043. On August 17, 2011, Mr. Diaz warned Plaintiff yet again regarding his "failure to provide consistent quality attention to work details." *Id.*, Diaz Ltr. to Ni 8/17/2011 (Exh. "3") at Bates No. ABOR0044; *see also* Def.'s SOF (Doc. 53), Documentation of Continual Performance Issues[2] (Exh. "3") at Bates No. ABOR0162. Plaintiff appealed this last warning to the Director, who upheld Mr. Diaz's warning. *Id.*, Wilson-Sanders Ltr. to Ni 9/26/2011 (Exh. "3") at Bates No. ABOR0047–ABOR0049. David White documented additional instances regarding Plaintiff's failure to follow policy in November and December 2011. Def.'s SOF (Doc. 53), Documentation of Continual Performance Issues (Exh. "3") at Bates No. ABOR0163.

---

[2] The Johnson Declaration refers to this document as a "Memorandum to File from David White regarding Pre-Disciplinary performance issues regarding Plaintiff." *See* Def.'s SOF (Doc. 53), Johnson Decl. (Exh. "1") at ¶ 21.

In early 2012, Plaintiff's ongoing unsatisfactory job performance resulted in a decision to place him on a six-month disciplinary probation period, beginning on January 27, 2012. *Id.*, Exh. "1" at ¶ 20 & Johnson & White Ltr. to Ni 1/27/2012 (Exh. "3") at Bates No. ABOR0050–ABOR0051. This decision was made jointly by University Animal Care management and supervisors. *Id.*, Exh. "1" at ¶ 20 & Exh. "3" at Bates No. ABOR0050–ABOR0051. The disciplinary probation period was to provide Plaintiff with a final opportunity to improve to a satisfactory level. *Id.*, Exh. "1" at ¶ 20 & Exh. "3" at Bates No. ABOR0050–ABOR0051.

During Plaintiff's disciplinary probation period, Plaintiff met with Dr. David Besselsen, Director of the University Animal Care Department. *See* Def.'s SOF (Doc. 53), Besselsen Ltr. to Wagner 11/1/2012 (Exh. "5") at Bates No. ABOR0172–ABOR0173. Dr. Besselsen emphasized to Plaintiff that "it was critical for him to follow [Standard Operating Procedures] as written, to ask questions of his supervisors for clarification if needed, to slow down if needed to ensure he followed [Standard Operating Procedures] correctly, and to suggest improvements for [Standard Operating Procedures] to David White, but to not change [Standard Operating Procedures] himself." *Id.*, Exh. "5" at Bates No. ABOR0172. Dr. Besselsen "also informed [Plaintiff] that he ha[d] a pattern of not following procedure that extend[ed] over several years despite coaching and retraining, and that this ha[d] severely eroded the trust [of his supervisors] . . . in his ability to correctly follow procedure[.]"[3] *Id.*, Exh. "5" at Bates No. ABOR0172. Also during Plaintiff's disciplinary probation period, Plaintiff made additional errors, and failed to adhere to applicable Standard Operating Procedures and policies. *See* Def.'s SOF (Doc. 53), Johnson and White Ltr. to Ni 7/27/2012 (Exh. "4") at Bates No. ABOR0056–ABOR0058 (pre-discharge letter outlining additional errors) & Johnson and White Ltr. to Ni 8/6/2012 (Exh. "4") at Bates No. ABOR0059–ABOR0061 (discharge letter reiterating errors by Plaintiff during disciplinary probation) & White Mem. to File

---

[3] Plaintiff claims that during this meeting he told Dr. Besselsen "about the tension between the Plaintiff and supervisor Mr. David White, and about the supervisor's discriminatory and hostile treatments of the Plaintiff[.]" Response (Doc. 54) at 4–5.

(Exh. "4") at Bates No. ABOR0164–ABOR0171 (recounting ongoing issues with Plaintiff's work). Plaintiff claims that in "late June or early July, . . . the department supervisor Cheryl Johnson, with another management person, brought a document of the discharge warning for one [sic] month probation period[,] . . . and hurried the Plaintiff to sign the paper[.]" Response (Doc. 54) at 4. Plaintiff claims he did not receive a copy of the document. *Id.* As a result of Plaintiff's ongoing shortcomings, Plaintiff was discharged from his position as an Animal Care Technician with the U of A's University Animal Care Department on August 6, 2012. *See* Def.'s SOF (Doc. 53), Exh. "4" at Bates No. ABOR0056–ABOR0061. No other University Animal Care Department employee was on disciplinary probation for unsatisfactory job performance, or otherwise, from December 20, 2011 through August 6, 2012. *Id.*, Exh. "1" at ¶ 25.

### 3. Appeal

Following his discharge, Plaintiff appealed the action pursuant to University of Arizona procedure. *See* Def.'s SOF (Doc. 53), U of A Staff Dispute Resolution Proc. Hr'g Rpt. 10/19/2012 (Exh. "7") & Comrie Ltr. to Ni 3/12/2013 (Exh. "8"). "On October 19, 2012, an appeal hearing was held concerning the discharge of Wanmei Ni . . . by the University of Arizona Animal Care Department[.]" Def.'s SOF (Doc. 53), Exh. "7" at ABOR0245. At that hearing, the University Animal Care Department was represented by Cheryl Johnson, and Plaintiff was also present. *Id.*, Exh. "7" at Bates No. ABOR0245. Neither party was represented by legal counsel. *Id.*, Exh. "7" at Bates No. ABOR0245. Upon making findings of fact and conclusions, "the three panel members unanimously recommend[ed] that the termination of Ni's employment be upheld, and that his appeal with respect thereto be denied." *Id.*, Exh. "7" at Bates No. ABOR0250. On March 12, 2013, Senior Vice President for Academic Affairs and Provost Dr. Andrew C. Comrie reviewed Plaintiff's appeal pursuant to university policy. *Id.*, Exh. "8" at Bates No. ABOR0251–ABOR0255. After review of "the entire record presented in this matter, including the transcript of the appeal hearing, the various notices related to [Plaintiff's] discharge, and the exhibits offered by the parties and admitted into the record, and

careful[] consider[ation] [of] the Panel's Findings, Conclusions and Recommendations[,]" Dr. Comrie "accept[ed] the Hearing Panel's findings of fact, conclusions, and recommendation, . . . [and] reject[ed] [Plaintiff's] appeal." *Id.*, Exh. "8" at Bates No. ABOR0251–ABOR0255.

### D. *Alleged Harassment*

### 1. **Discriminatory remarks and conduct**

Plaintiff alleges that "one morning [in] May, 2012, one coworker Mr. Michael Anderson, who is very closed [sic] to the supervisor of Mr. David White, came to the plaintiff in the lunch break room of the facility, point on [sic] the plaintiff and said, "you, Chinese, Chink[.]" Amended Compl. (Doc. 26) at 2:39–42. Plaintiff again mentions this incident in his Supplemental Brief (Doc. 56) responding to Defendant's motion for summary judgment. Plaintiff states that there was a witness, whose name he has forgotten.[4] Plaintiff suggests that "this happened on several occasions[,]" and alleges that "Mr. David White . . . simply turned a deaf-ear of [sic] Mr. Michael Anderson [sic] slurs and never stopped Mr. Michael Anderson's such [sic] behavior, even though he was fully aware of the nature of what's [sic] happening."[5] Pl.'s Response (Doc. 54) at ¶ 1.

Plaintiff also states that "[d]uring the breaks, the colleagues, including Mr. David White, often gathered to chat and tell jokes, but the Plaintiff liked to make better use of the time by practising [sic] writing Chinese and Tibetan characters on waste papers, which irritated Mr. David White[.]" Response (Doc. 54) at ¶ 2. Plaintiff alleges that "on several occasions during the break, Mr. David White was laughing or joking with other co-workers, but immediately stopped smile and changed to a scowl face when he saw the Plaintiff walked into the working place[,] [and] . . . Mr. David White told the Plaintiff to stop writing the Chinese and Tibetan characters because Mr. David White believed that

---

[4] Plaintiff alleges that he requested disclosure of this information from Defendant, which was never provided; however, his attachments in support of this assertion show only his Initial Disclosure Statement (Exh. "6") and Defendant's First Supplemental Disclosure Statement (Exh. "7"). There is nothing before the Court to suggest that Plaintiff asked Defendant for this information, nor is there any statement from the alleged witness.

[5] The record is devoid of evidence to support this allegation.

the Plaintiff might be writing some curse words on him."[6]  *Id.*; *see also* Amended Compl. (Doc. 26) at ¶ 7.

Plaintiff alleges that on May 15, 2012, one of his co-workers, Mr. Tom, told Plaintiff that David White was constantly watching him.  Response (Doc. 54) at ¶ 3. Plaintiff alleges that David White "had been watching the Plaintiff's every move at work or during the break . . . trying to find fault with the Plaintiff."  *Id.*  At some point, Plaintiff allegedly told Mr. Tom that "if I am kicked out, I will go to court [sic] charge them for discrimination."  Pl.'s Suppl. Brief (Doc. 56) at ¶ 3.

## 2.  Discriminatory treatment

Plaintiff alleges that "[o]n August 17, 2011, the outsourced Engineer Mr. Ron who, having serviced the autoclave machine made a wrong temperature setup[,] [and] . . . had also changed the safety valves."  Response (Doc. 54) at ¶ 6.  Plaintiff further alleges that as a result, he was unable to properly run a "flash cycle," which he reported to his supervisor Miguel Diaz.  *Id.*  Mr. Diaz allegedly told Plaintiff "to run the flash load in the 'Wrapped Cycle[,]'" which resulted in deformation of some equipment.  *Id.*  Plaintiff claims that he "was only responsible for working on the clean side during that period[,]" but the evidence "of the wrong temperature setup [was] on the dirty-side of the operation facility."  *Id.*  Plaintiff claims that he was wrongly blamed for this incident.  *Id.*

Plaintiff alleges that "[a]ccording to SOP, an indicator (a piece of sticky-paper with heat sensor to monitor the steam temperature during the machine operation) should be stuck on the wrapper of any equipment before the equipment is pushed on a cart into the autoclave."  Response (Doc. 54) at ¶ 5.  Plaintiff states that on February 26, 2012, he "pushed the cart loaded with several pieces of equipment inside the autoclave room and parked the cart in front of the autoclave machine with its door still closed[.]"  *Id.* Plaintiff asserts that the "SOP only requires an indicator on the equipment before it is

---

[6] Plaintiff attached two sheets of paper with Tibetan and Chinese characters.  *See* Pl.'s Mem. of Fact Papers (Doc. 54-1), Exhs. "C1" & "C2."  The Court notes that what the characters say is immaterial to the motion for summary judgment.

pushed into the autoclave machine, it does not require that the indicator must be on the equipment before it is pushed into the room where the autoclave machine stands." *Id.* As such, Plaintiff takes issue with David White writing him up for this incident, and asserts that his "white co-worker, Ms. Mandy, worked exactly the same way as the Plaintiff had done on the autoclave machine, she did not get a write-down and did not get trouble from the management either."[7] *Id.*

Plaintiff also alleges that on February 27, 2012, David White assigned him "to fill and put the cages into [sic] a tall rack which is about 72 inches high and it is [sic] too tall for the plaintiff to reach." Amended Compl. (Doc. 26) at ¶ 6; *see also* Response (Doc. 54) at ¶ 4. Plaintiff alleges that Mr. White became angry with Plaintiff, because he used the small racks to fill the cages and transferred them to the high rack later. Amended Compl. (Doc. 26) at ¶ 6; *see also* Response (Doc. 54) at ¶ 4. Plaintiff argues that "either way is in principle not violating the SOPs." Response (Doc. 54) at ¶ 4. Plaintiff further alleges that "other employees used the same method in the [sic] similar situations, [but] Mr. David White never saw that as a problem to write anyone down." Response (Doc. 54) at ¶ 4; *see also* Amended Compl. (Doc. 26) at ¶ 6.

### 3. Alleged theft

Plaintiff alleges that "[j]ust two days before the discharge, someone from UAC sneaked into Plaintiff's private house in the night, unlocked the door, took the Plaintiff's backpack from the living room to outside yard[,] placed the bag on a chair by the swimming pool, stole the Plaintiff's UA-ID and all working keys from the bag, and then threw the key string outside a neighbor's fence." Response (Doc. 54) at 5. Plaintiff further alleges that he "later found out the thief was sent by UAC management." *Id.* In support of this contention, Plaintiff asserts that "Cheryl Johnson personally returned Plaintiff's missing total 9 of 11 keys to University Key Office[.] Pl.'s Suppl. Brief (Doc. 56) at ¶ 10.

. . .

---

[7] The record does not contain any statement or deposition testimony by "Ms. Mandy."

## 4. Reporting

During his five (5) years of employment, Plaintiff did not raise or report to anyone in the University Animal Care Department any allegations or concerns regarding disparate treatment discrimination or hostile work environment issues based on his race or national origin. Def.'s SOF (Doc. 53), Johnson Decl. (Exh. "2") at ¶ 26. After Plaintiff's discharge, the University Animal Care Department learned that sometime between Plaintiff's failure to successfully complete disciplinary probation and his discharge, Plaintiff had a preliminary discussion with the University of Arizona Office of Institutional Equity, but did not choose to file a complaint, or otherwise alert the University Animal Care Department of such allegations prior to his discharge. *Id.*, Exh. "2" at ¶ 27. Plaintiff claims that he had reported these issues "to higher management in the department and the University, such as Dr. David Besselsen, the head of the Animal care department of the university, the EEOC office in the university, the human resources office, the working related office, but it did not make any help to improve the situation[.]" Amended Compl. (Doc. 26) at ¶ 8. On October 15, 2012, Plaintiff filed a charge of discrimination with the Arizona Civil Rights Division. Def.'s SOF (Doc. 53), Charge of Discrimination (Exh. "6") at Bates No. ABOR0074.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Thus, factual disputes that have no bearing on the outcome of a suit are irrelevant to the consideration of a motion for summary judgment. *Id*. In order to withstand a

motion for summary judgment, the nonmoving party must show "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Moreover, a "mere scintilla of evidence" does not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. The United States Supreme Court also recognized that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).

## III. ANALYSIS

### A. *Evidentiary Objections*

Defendant asserts that Plaintiff's responsive filings do not comply with either the Federal Rules of Civil Procedure or with this district's Local Rules. *See* Def.'s Reply (Doc. 59) 1–9. As such, Defendant urges the Court to summarily grant it summary judgment. *See id.*

Federal Rule 56(c) mandates that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials [in the record.]" Fed. R. Civ. P. 56(c)(1). A fact that "cannot be presented in a form that would be admissible in evidence" is grounds for objection. Fed. R. Civ. P. 56(c)(2). Moreover, the Rules of Practice of the United States District Court for the District of Arizona ("Local Rules") require that"[e]ach additional fact . . . must refer to a specific admissible portion of the record where the fact finds support." LRCiv. 56.1(b). After Plaintiff filed his initial response, the Court notified him of the requirements of Rule 56, Federal Rules of Civil Procedure, and LRCiv. 56.1, and allowed him to supplement his response accordingly.

*See* Order 11/28/2017 (Doc. 55). It is not the Court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247 251 (7th Cir. 1995)).

Here, Plaintiff's controverting facts do not contain a single citation to the record. Rather, Plaintiff indicates that certain witnesses should come forward with evidence to support his assertions, or that the Court should conduct further inquiry. *See, e.g.,* Pl.'s Suppl. Br. (Doc. 56) at ¶¶ 2, 4 ("Regarding the Chinese and Tibetan characters on waste papers . . . the court may appoint a professional translator to translate into English." and "Regarding the autoclave machine indicator procedures issue, . . . Ms. Mandy should stand out as a witness in good faith."). Although the Court declines Defendant's invitation to summarily grant it summary judgment for these shortcomings, bare factual allegations and conclusory statements have not been given any weight. *See, e.g.,* Pl.'s Response (Doc. 54) at 5 (alleging without citation or support that someone from the Animal Care Department broke into his home and stole his keys).

## B. *Statute of Limitations*

On October 15, 2012, Plaintiff filed a charge of discrimination with the Arizona Civil Rights Division. Def.'s SOF (Doc. 53), Charge of Discrimination (Exh. "6") at Bates No. ABOR0074. "Section 2000e-5(e)(1) requires that a Title VII plaintiff file a charge with the Equal Employment Opportunity Commission ("EEOC") either 180 or 300 days after the alleged unlawful employment practice occurred." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104–05, 122 S.Ct. 2061, 2068 (2002) (internal quotations omitted). Based upon the filing date of October 15, 2012, the limitations period began the 300 days prior on December 20, 2011. *See id.*

As an initial matter, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113, 122 S.Ct. at 2072. Unlike discrete acts, however, hostile environment claims by "their very nature involve[] repeated conduct." *Id.* at 115, 122 S.Ct. at 2073 (citations omitted). As such, "[t]he 'unlawful employment practice' . . . cannot be said to occur on any particular day."

*Id.* Hostile environment claims "occur[] over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* (citations omitted). Accordingly, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *National R.R. Passenger Corp.*, 536 U.S. at 117, 122 S.Ct. at 2074.

Here, Plaintiff has alleged both discrete acts of disparate treatment and a hostile work environment. *See* Amended Compl. (Doc. 26). One of Plaintiff's charges alleges that on August 17, 2011, "the department blamed the plaintiff in writing that the plaintiff failed to follow the autoclave operation SOP, and did not report the high temperature settings." Amended Compl. (Doc. 26) at 2–3. Plaintiff believes that he suffered negative consequences due to his Chinese national origin. *See id.* This discrete act of disparate treatment falls outside of the statute of limitations. As such, this incident must be dismissed. Plaintiff's other disparate treatment claims fall within the limitations period, and will be discussed below. Additionally, the Court will consider Petitioner's hostile environment claims for the entire period alleged.

## C. *Disparate Treatment*

### 1. Legal standard

Title VII of the Civil Rights Act of 1964 provides that:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). "Under Title VII, an individual suffers disparate treatment

'when he or she is singled out and treated less favorably than others similarly situated on account of race.'" *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (quoting *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir. 1988)). "To establish a *prima facie* case under Title VII, a plaintiff must offer proof: (1) that the plaintiff belongs to a class of persons protected by Title VII; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)).

Once a plaintiff establishes a *prima facie* case, "[t]he burden then must shift to the employer to articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1825. If the employer produces evidence of a legitimate nondiscriminatory reason for the employment action, the plaintiff must offer proof that the reason is actually a pretext for racial discrimination. *McGinest*, 360 F.3d at 1123; *see also Cornwell*, 439 F.3d at 1028. "A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).

### 2. *Prima facie* case

Defendant argues that Plaintiff cannot establish a *prima facie* case of discrimination, and therefore his claims must fail. Def.'s Mot. for Summ. J. (Doc. 52) at 10–11.

### a. Protected class

It is undisputed that Plaintiff is Chinese, and his national origin represents a protected class. As such, Plaintiff establishes the first prong of his *prima facie* case.

 . . .

### b.  Job performance

Subjectively, Plaintiff believes that his work performance was satisfactory because he had successfully completed job training courses, passed his initial probationary period, and received a certificate of excellence in 2007.  Pl.'s Response (Doc. 54) at 1.  In support of his belief, Plaintiff attached various certificates indicating that he had successfully complete certifications, as well as certificates of appreciation for his work. *See id.*, Exhs. A1–A7 & B1–B6.  Objectively, the testimony and records demonstrate that Plaintiff had performance issues as far back as 2009, and prior to David White becoming his supervisor.  Def.'s SOF (Doc. 53), Diaz Ltr. to Ni 10/20/2009 (Exh. "3") at Bates No. ABOR0041–ABOR0044; *see also* Def.'s SOF (Doc. 53), Documentation of Continual Performance Issues (Exh. "3") at Bates No. ABOR0162–ABOR0163; Def.'s SOF (Doc. 53), Wilson-Sanders Ltr. to Ni 9/26/2011 (Exh. "3") at Bates No. ABOR0047–ABOR0049.

"[A]n employee's subjective personal judgements of [his] competence alone do not raise a genuine issue of material fact." *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (citing *Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986)).  "Nor may a plaintiff create a genuine issue of material fact by relying solely on the plaintiff's subjective belief that the challenged employment action was unnecessary or unwarranted." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 n. 6 (9th Cir. 2006) (citing *Bradley*, 104 F.3d at 270).

Here, Plaintiff's documentation regarding the sufficiency of performance only show that he remained certified, and that he received generic certificates of participation in the work environment.  There is nothing to contradict Defendant's substantial records regarding insufficient performance.  As such, Plaintiff has failed to establish that he was performing his job satisfactorily.

### c.  Adverse employment action

It is undisputed that Plaintiff was placed on probation and ultimately terminated. As such, he suffered an adverse employment action.

### d.  Different treatment from similarly situated employees

Plaintiff alleges that white co-workers were not written up despite performing a task identically to him.  *See, e.g.*, Response (Doc. 54) at ¶ 5 (describing a February 2012 write-up for failing to follow proper procedure regarding placing an indicator on equipment prior to autoclaving, where Plaintiff was written up, but his white co-worker was not).

"[I]ndividuals are similarly situated when they have similar jobs and display similar conduct."  *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (citing *Ward v. Proctor & Gamble Paper Prods. Co.*, 111 F.3d 558, 560–61 (9th Cir. 1997)); *see also Wall v. Nat'l R. R. Passenger Corp.*, 718 F.2d 906, 909 (9th Cir. 1983) (upholding district court's finding that employees were not similarly situated where plaintiff had a prior disciplinary record and white co-workers did not).  Here, beyond Plaintiff's mere allegation, there is no evidence to support that his co-workers performed tasks "identically" to him without repercussion.  Moreover, there were no other Animal Care Department workers on probation during the time of Plaintiff's probation and termination.  As such, Plaintiff cannot show that he was treated differently from similarly situated employees.

### e.  Conclusion

Plaintiff cannot establish a *prima facie* case of disparate treatment.  Even if the Court were to accept that Plaintiff established a *prima facie* case, there is nothing in the record to rebut Defendant's legitimate, non-discriminatory reasons for terminating Plaintiff's employ.  Plaintiff had ongoing disciplinary issues, was placed on probation, and ultimately terminated.  Plaintiff has not provided any evidence to suggest that this course of action was a pretext for discrimination.  As such, Defendant is entitled to summary judgment regarding Plaintiff's disparate treatment claims.

### D.    *Hostile Work Environment*

"A hostile work environment claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of

those harassed." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). "To prevail on a hostile workplace claim premised on either race or sex, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment to create an abusive work environment." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). "To determine whether conduct was sufficiently severe or pervasive to violate Title VII, we look at 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Further, the conduct must create an objectively hostile or abusive work environment, and the victim must subjectively perceive the environment to be abusive in order to implicate Title VII. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). "Objective hostility is determined by examining the totality of the circumstances and whether a reasonable person with the same characteristics as the victim would perceive the workplace as hostile." *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (citations omitted). Subjective hostility requires a showing that the employee "perceived [his] work environment to be hostile, and that a reasonable person in [his] position would perceive it to be so." *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1034 (9th Cir. 2005) (citations omitted).

Here, Plaintiff alleges one instance in May 2012 during which a co-worker used a derogatory term in reference to Plaintiff. Amended Compl. (Doc. 26) at 2:39–42. Although Plaintiff in response to summary judgment alleges that this occurred on "several occasions[,]" he provides no further detail or evidence. *See* Response (Doc. 54) at ¶ 1. "Because only the employer can change the terms and conditions of employment, an isolated incident of harassment by a co-worker will rarely (if ever) give rise to a reasonable fear that [racial] harassment has become a permanent feature of the

employment relationship. *Brooks*, 229 F.3d at 924. "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283 (1998).

Additionally, Petitioner points to three (3) instances which he alleges demonstrate that David White discriminated against him creating a hostile work environment. Two of those involved Mr. White reprimanding Plaintiff for not following standard operating procedure.[8] The third may be evidence that Mr. White did not like Plaintiff, but it does not support a finding of a hostile work environment. "When compared to other hostile work environment cases, the events in this case are not severe or pervasive enough to violate Title VII." *Vasquez*, 349 F.3d at 643. Based on the totality of the circumstances, no reasonable person would perceive the workplace to be hostile. Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's hostile work environment claim.

## IV. CONCLUSION

Based upon the foregoing, the Court finds that Plaintiff has failed to meet his burden in opposing Defendant's motion for summary judgment. Accordingly, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (Doc. 52) is GRANTED. IT IS FURTHER ORDERED that this matter is DISMISSED WITH PREJUDICE. **The Clerk of the Court shall enter judgment and close the case.**

Dated this 19th day of March, 2018.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge

---

[8] Plaintiff alleges that his August 2011 reprimand regarding the autoclave also resulted because of his national origin. The Court notes, however, that Miguel Diaz was Plaintiff's supervisor during this incident. Plaintiff does not make any claims regarding Mr. Diaz contributing to a hostile work environment.